LIZZIE CAVEN, Admx., *vs.* THE BODWELL GRANITE COMPANY.

Knox.    Opinion November 28, 1904.

*Negligence.    Master and Servant.    Evidence.    Exceptions.*

1. It is not strictly accurate to say that the law, in measuring the care incumbent upon a master and that owed by a servant, recognizes different standards of care or negligence. Care in every such case is to be measured by reasonableness under all the circumstances of the particular injury. And reasonable care is synonymous with "ordinary" or "due" care.

2. It is the duty of a master to use reasonable care in furnishing his servants reasonably safe appliances with which to work, and in keeping them reasonably safe thereafter, and if the appliances are of such a character as to be likely to become weak, or worn, or out of order by time or use, reasonable care requires the master to make examinations or inspections at reasonable intervals, in order that defects may be discovered and remedied. While the servant is bound to use his eyes and his mind, and to see the things before him which are obvious, and is chargeable with knowledge of the conditions and things which he sees, or ought by the exercise of reasonable care to see, he is not ordinarily bound to examine or inspect appliances, or to discover dangers not obvious, unless charged with that duty by the master, or by the character of his work. He may rely upon the presumption that the master has inspected. It follows

therefore that the care which the master owes cannot be measured by the care which the servant owes. A greater degree of diligence is incumbent upon the master, and that is only reasonable care on his part.

3. A request for instructions that the jury find for the requesting party, based upon a part only of the issues involved, is properly refused.

4. Whether a servant assumed a risk or was guilty of contributory negligence with respect to defective appliances he was using, depends not upon the mere fact that he saw or handled the appliances, but rather upon whether he saw, or ought by reasonable care to have seen,—or knew, or ought by reasonable care to have known,—their defective condition.

5. Re-direct examination of a witness calling out a repetition of a matter which was elicited in a proper cross-examination, is not exceptionable.

6. It is not improper on cross-examination to test a witness by calling for his opinions and conclusions, for the purpose of affecting his credibility, and if the cross-examiner happens to elicit an opinion unfavorable to his view of the case, it cannot be said that he is prejudiced if his adversary on re-examination obtains a repetition of the opinion.

7. An inadmissible question was asked, and against objection, answered. But the Justice presiding, expressing doubts as to its competency, immediately framed another question to be asked in its stead, all of which was in the presence of the jury.

*Held;* that under the circumstances of the case, the error was sufficiently remedied, and that the defendant received no harm.

8. *Also;* that the evidence is sufficient to warrant the jury in finding that the defendant was negligent, and that the plaintiff's intestate neither knew nor by the exercise of reasonable care ought to have known of the defect in the appliance which caused his death. In such a case, he assumed no risk, and was guilty of no negligence.

Motion and exceptions by defendant.    Overruled.

Action brought by the plaintiff as administratrix of her deceased husband, James Caven, to recover under the statute of 1891, c. 124, giving a right of action in case of immediate death for the loss suffered by her, (there being no children) because of the death of her said husband, which death was the result of a stage breaking down, over which stage, coal was being unloaded from a vessel by the defendant at its works at Spruce Head in the town of South Thomaston. Plea, general issue.

The verdict was for the plaintiff for $3,787.08

The case appears in the opinion.

*Merritt A. Johnson,* for plaintiff.

*C. E. and A. S. Littlefield,* for defendant.

SITTING:  WHITEHOUSE, STROUT, SAVAGE, PEABODY, SPEAR, JJ.

SAVAGE, J.  The plaintiff is administratrix and widow of James Caven, and brings this action to recover damages for the loss sustained her through his immediate death, alleged to have been caused by the negligence of the defendant, in whose employment he then was.  The verdict was for the plaintiff, and the case comes up on the defendant's motion and exceptions.

It appears from the bill of exceptions that Caven was foreman of the defendant's quarry, and as such had charge of loading and unloading vessels at the defendant's wharfs and of selecting from the materials furnished by the defendant such gear as might from time to time become necessary, but had never put up any gear for coal vessels, nor had he unloaded them.  At the time of the accident which caused his death, he was at work, with a crew of men under him, unloading defendant's coal from a vessel at its wharf.  The stage on which the unloading of coal was done consisted of a stationary wheeling stage extending from the coal shed to the front of the wharf, and a movable stage which, when in use, projected from the outer end of the stationary stage over the hold of the vessel.  Two posts supporting the outer end of the stationary stage rested on the capsill of the wharf underneath the stage, and extended about fourteen feet above the level of the stage.  At the top, these posts were connected by a timber into which their ends were mortised.  When the movable stage was not in use, it lay upon the stationary stage.  But when it was to be used, it was pushed out so far that its inner end rested upon and was supported by the outer end of the stationary stage, and its outer end was supported by guys or wire cables reaching from each outer corner to the tops of the posts.  These guys were fastened permanently at each end.  Other guy cables, one for each post, extended back from the posts towards anchorages in the ground.  These were attached permanently to the top of the posts at the outer end.  The inshore ends of these guys were made fast to their anchorages by means of tackles, one end of which was hooked into an eye, made by turning the end of the wire guy back on itself and fastening it to the main wire by clamps, and the other end of the

tackle was hooked into an eyebolt in the anchorage. In preparing the stage for use, it was only necessary to make the inshore ends of the guys fast to the anchorages by these tackles, draw them to a proper tension, and then push the movable stage out over the vessel. All the guys and other appliances except the tackles were parts of the permanent structure, furnished by the defendant for the use of its servants. The tackles were selected by the servants as they had occasion to use them, and in this case were selected by Caven. The defendant's superintendent testified that he cautioned Caven "to be sure and select good tackle" and "to be sure and make them (the guys) secure." And Caven, or the men under his immediate supervision, hooked the tackle into the eye of the north guy, the breaking of which, it is claimed, caused his death. Two men under his direction assisted him in making the end of this guy secure to the anchorage, and each of them testified that he did not hook the tackle into the eye of that guy.

After Caven and his men had prepared the stage, and while they were unloading coal from the vessel, the movable stage, upon which they were standing, fell, and Caven was thrown down upon the vessel and instantly killed. Upon examination, it was found that the two posts which have been described had broken off level with the stationary stage, and that the northern wire guy had broken in the eye into which the tackle had been hooked. The plaintiff contends that the posts were weak, rotten and defective, that the breaking of the posts, letting the stage fall, was the proximate cause of the injury, and that the eye in the guy was broken by the great and sudden strain which came upon the guy when the posts gave way, and the movable stage which was supported by them fell. On the other hand, the defendant contends, and we think with better reason, that the eye in the wire guy broke first, and that the posts, being no longer sustained by the inshore guy, were pulled over towards the vessel and broken by the weight of the movable stage and of the men and coal upon it, and therefore that the breaking of the wire guy in the eye was a proximate cause of the injury. The defendant further contends that, under the circumstances stated, Caven was charged with the performance of the duty of the master in seeing that that

part of the guy to which the tackle was attached was sufficient for the purpose intended, and, therefore, that if the guy was insufficient, and the defendant on that account to be held negligent, it is only because Caven himself was negligent, in which case, of course, the plaintiff cannot recover.

Before passing to a consideration of the exceptions based upon this contention, we may say that we do not think the contention itself is well grounded. As already stated, the guys formed a part of the completed structure furnished by the defendant for the use of its servants, and the case is barren of evidence tending to show that Caven's attention was in any way specifically directed to the sufficiency or insufficiency of the guy, or that he was charged with any duty respecting the guy except to make it fast to the anchorage, or that he had any reason for supposing that his master had not performed its full duty in using reasonable care to provide him with a reasonably safe guy. It is true that the superintendent testified that he told Caven to be sure to select good tackle, and to make the guys secure. He did select good tackle, or at any rate, tackle that did not break. And we do not think that the caution to make the guys secure, could have been intended, or understood, as meaning a direction to make examination of, or do anything with, the guys themselves, but rather to see that the eyes and tackle were securely hooked together. If the superintendent had intended that Caven should do more, it is singular that he failed to say so, in apt terms.

We will now consider the exceptions seriatim, all of which relate to the guy which broke.

1. In his charge, the presiding justice in instructing the jury concerning the care which the master is bound to use for the safety of the servant, in providing him a place to work in, and the care which the servant is bound to use for his own safety, used the following language:—"He (Caven) was there as a laborer, without being expected to have the expert knowledge that has been displayed perhaps by some experts who have been called to the stand." Also:—"Now, a greater degree of care in this respect is required of the corporation, the master, than is of the servant, because it is particularly and especially the duty of the master to see that a safe

place is provided to the extent which I have already described, by exercising reasonable care in this respect. It is only the duty of the servant · to exercise ordinary care, taking into consideration the assumption that the master in the first instance had done his duty. So that a greater degree of diligence is imposed upon the master in providing and maintaining a reasonably suitable place, than is upon the servant to examine before he goes there."

This instruction related evidently to the contention of the defendant that the weakness of the eye of the guy wire was obvious, and should have been noticed by Caven, that it was as obvious to Caven as it could have been to the defendant, and that therefore it was negligence in Caven in not observing it, as certainly as it was in the defendant to permit it to be used in the condition in which it was.

We think the instruction was unexceptionable. It is true that the presiding justice used the expression that the master is bound to use "a greater degree of care" than the servant, and if it were meant by the phrase to say that the law recognizes different standards of care or negligence, it would not be strictly accurate. The better doctrine is that care or the want of it is not to be measured arbitrarily according to fixed definitions, as "slight care," "ordinary care," or "extraordinary care," or "slight negligence," or "gross negligence," although all these phrases are used somewhat loosely by courts and law writers, but it is to be measured by reasonableness, under all the circumstances of the particular inquiry. The only true measure is reasonable care. And that expression has been declared by the courts in England and elsewhere to be synonymous with "ordinary care." *Fletcher* v. *Boston & Maine R. R.,* 1 Allen, 9. Reasonable care is a relative term, and what is reasonable care in a given case depends upon many considerations. What would be reasonable care under some conditions would clearly be negligence in others. Reasonable care and vigilance vary according to the exigencies which require vigilance and attention. They relate to the work to be done, to the instrumentalities to be used, to the dangers that may result from their use, to the varying duties owed by those who supply or use them. And in all cases reasonable care means such care as reasonable and prudent men use under like circumstances. *Bigelow*

v. *Reed,* 51 Maine, 325; *Palmer* v. *Lumber Asso.,* 90 Maine, 93; *Sawyer* v. *Arnold Shoe Co.,* 90 Maine, 369; *Cayzer* v. *Taylor,* 10 Gray, 274; *Cunningham* v. *Hall,* 4 Allen, 268; *Holly* v. *Boston Gas Light Co.,* 8 Gray, 123. These general remarks are well illustrated in this case.

As has been many times stated in various cases in this state, it is the duty of a master to use reasonable care in furnishing his servants reasonably safe appliances with which to work, and a reasonably safe and suitable place in which to work, and in keeping them reasonably safe thereafter. This is a primary duty. If the appliances are of such a character as to be likely to become weak or worn or out of order by time or use, reasonable care requires the master to make examinations or inspections at reasonable intervals, in order that defects may be discovered and remedied. And the servant has a right, so far, to rely upon the presumption that the master has done its duty in all these respects. The servant on his part is bound to use reasonable care. He is conclusively held to have assumed the risks of dangers which are known to him, and as well, those which are incident to his work and which are obvious and apparent to one of his intelligence and experience. Though he may have the benefit of the presumption that his master has performed its duties, yet he is bound to use his eyes and his mind, and to see the things before him which are obvious. He is chargeable with knowledge of the things and conditions which he sees or ought, by the exercise of reasonable care, to see. And the master has a right to presume that he will see and guard against obvious dangers. If the servant fails in this respect, he is negligent. But he is not ordinarily bound to examine or inspect appliances, or to discover dangers not obvious. He is not bound to do so, unless charged with that duty by the master, or by the character of his work. He may rely upon the presumption that the master has inspected. It is therefore evident that the care which the master owes cannot be measured by the care which the servant owes. A greater degree of diligence is incumbent upon the master. Unless he uses it, he cannot be said to have exercised reasonable care. The charge of the presiding justice, which is made a part of the bill of exceptions, shows that, again and again, in apt and

accurate language, he instructed the jury as to care required of the master, and that required of the servant. We do not think the jury could have been misled, or the defendant prejudiced by the use of the phrase "greater degree of care."

2. The defendant requested that the jury be instructed that if Caven "attached the tackle to the eye of the northern guy, and a want of safety in that eye caused or contributed to this injury, the plaintiff cannot recover."

3. It also requested an instruction that if Caven was in charge of securing the northern guy, or it was secured under his supervision, and a want of safety in the eye of that guy caused or contributed to this injury, the plaintiff cannot recover.

Both of these requests, which may be considered together, were properly refused. These requests seek to place Caven's assumption of risk, or contributory negligence, as the case may be, solely upon the mere fact that he attached the tackle to an unsafe eye, or that he was in charge and had the supervision of securing the guy. They entirely omit the important and only debatable issue upon this branch of the case, and that is, whether Caven saw, or ought by reasonable care to have seen,—knew, or ought by reasonable care to have known,—the weak and dangerous condition of the eye. He may have done all that the requests assume that he did, and yet not have seen or known the defect, or be chargeable with knowledge of its existence. If he did not know, or by the exercise of reasonable care would not have known, the defect, the mere fact that he hooked the tackle into the eye of the guy, or supervised the operation of securing the guy, are, so far, immaterial. These facts showed an opportunity for Caven to observe, but they did not show that he saw. Nor did they show what he would have seen, by the exercise of reasonable care. Admitting that he had the opportunity to observe, it was still for the jury to say whether he did observe, and thereby assumed the risk, or negligently failed to observe, and was thereby guilty of contributory negligence.

4. The defendant contended that the weakness of the eye of the guy was so apparent that Caven, by the exercise of reasonable care at the time the tackle was hooked into it, should have discovered the

defect. The plaintiff contended to the contrary. One Hart, a witness called by the plaintiff, who examined the wire after the break and testified in chief as to its apparent condition, on redirect examination was allowed, against objection, to testify as follows:

Q. Then you say that you might take it up and not notice it?

A. Yes, sir.

Q. I will ask you whether or not a person by ordinary handling of the wire same as I pick this up to hook something into it, would notice that the strands had been rusted off?

A. No, sir.

THE COURT: I don't know as that question is exactly competent, except that the matter has been gone over so voluminously and in such detail in cross-examination. He may answer this question: as to whether or not the condition of the wire at the place of the break which he has described was such that it would be likely to be noticed by a person who simply handled it or looked at it without making an examination of it?

A. No, sir. I will say that they were not.

The court stated that the last question was allowed simply because of counsel's lengthy cross-examination upon precisely the same point. A reference to the cross-examination shows that the witness was asked by the defendant's counsel if the defective condition of the eye would have been perfectly apparent to anyone examining it before it was broken, if it would have been very easy for anyone having anything to do with the guy to see that condition, and he answered in the affirmative. He was asked if the rusty and worn out condition was not perfectly apparent to anyone who had anything to do with the end of that guy before it broke, and the answer was, "For a man that examined it, yes sir, he could tell." Being asked in various forms about the necessity of an examination in order to notice the defective condition of the guy, the witness answered finally in these words. "Merely pick it up and not examine it, why a man might pick up that guy and not examine it and think it was all right."

Then on re-examination, the two questions following were asked and answered without objection:

Q. Speaking about the guys being rusty, did I understand you

to say that a man without looking at that guy, or without examining it carefully, could tell that the pieces were rusted off, or would he have to examine it?

A.   Couldn't tell standing looking at the guy, looking at it.

Q.   What do you mean, he would have to examine it in order to find it?

A.   Have to examine it, yes; a man might pick that guy up and if he wasn't thinking anything about it he couldn't tell; he could see that it was black and rusty.

Then followed the first question to which objection was made as above stated:—"Then you say he might pick it up and not notice it?" It is a sufficient answer to this objection and to the objection to the question as framed by the presiding justice to say that they are in effect merely repetitions of questions relating to the same matter which were put on cross-examination. The defendant complains that the questions called for the opinion or conclusions of the witness, that the witness was not an expert, and the subject matter was not the subject of expert testimony; that because the witness had given such testimony on cross examination affords no reason why the plaintiff should be allowed to call for his opinion on redirect examination; that the admission of incompetent evidence on one side is not ground for the admission of incompetent evidence on the other. But the question presented by the exception does not go so far as the defendant's contention does. This is not a case where incompetent evidence was admitted on one side because the same or other equally incompetent evidence by the same or other witnesses, had been admitted on the other side. It is a case of the re-examination of a witness on a matter drawn out on his own cross-examination. The cross-examination was entirely proper as to subject matter. It was competent on cross-examination for the defendant, by way of testing the witness and for the purpose of breaking the force of his direct testimony, to ask for his opinions and conclusions, not as opinion evidence, but hoping to be able thereby to show that he was unreliable, and that his opinion would prove to be inconsistent with the facts. In this way the effect of direct testimony is frequently qualified or destroyed. Hardly anything in cross-examination is more common than this

method of examination.    Now if in the course of a cross-examination, the cross examiner has elicited an opinion unfavorable to his view of the case, can it be said that he is prejudiced if his adversary in re-examination of the same witness upon the same subject repeats the same question and draws out a repetition of the same answer?    We think not.    The extent to which such re-examination is permissible must, of course, be within the discretion of the court.

The second question to which objection was taken was, we think, inadmissible, and so the presiding justice appears to have thought. Though the question was answered, the justice expressed his doubts as to its competency, and immediately framed another question which might be asked in its stead.    All this was done in the presence of the jury.    The error was at once corrected.    And it does not appear to us that, under the circumstances, the defendant was harmed.    The jury could not have failed to understand that the answer given to the question framed by the court was the only answer to stand for their consideration.    It certainly must have been as effective upon the minds of the jury for the justice to do what was done in this instance, as it would have been for him to say, as is said so many times of incompetent and immaterial answers, "Strike the answer out."    It would be intolerable if an error like the one under consideration could not be immediately remedied.    Whether the remedy is deemed sufficient must, of course, depend upon the circumstances of each case.    No hard and fast rule can be applied.    We are satisfied with the remedy in this case.

5.    The motion.    The issues in the case have been so fully discussed in considering the exceptions, that it will be necessary to refer to them only briefly under the motion for a new trial.    We assume as the defendant does that the breaking of the eye in the guy was the proximate cause of Caven's death.    The defendant does not seriously contend that the eye of the guy was in a reasonably safe condition, or that the unsafe condition would not have been disclosed to it, had it used reasonable care to inspect.    The defendant rather contends it was so obviously broken, rusted and worn that Caven must have known and appreciated its condition if he saw it, and so must have assumed the risk, or that if he failed to see it it was only through his

own want of due care; in short, that he knew its condition, or ought to have known it. And hence it is claimed that under either hypothesis, the plaintiff cannot recover.

It does not appear that Caven had any previous knowledge of this guy, nor that he knew how long it had been used, or to what wear and tear it had been subjected. It does not appear that he had any information which would make him apprehensive of the danger of its breaking, or had by word or circumstance been put upon his guard. The words of the superintendent to him "to be sure to select good tackle" and "to be sure to make the guy secure" did not go to that extent. Nothing but the appearance of the guy, such as it was, was a warning to him. Whether that appearance was so obviously bad that his failure to perceive it under the circumstances amounted to want of reasonable care was the question submitted to the jury, and we cannot say that in their answer they have manifestly erred. Caven's only duty with regard to that eye was to hook a tackle into it. He was not called upon to inspect, as the defendant ought to have done. For that he might properly rely upon the presumption that the master had performed its duty. *Twombly* v. *Consolidated Electric Light Co.*, 98 Maine, 353. We think the jury were warranted in finding that a reasonably prudent workman, under the circumstances of this case, engaged in his work, and acting with reasonable care, having only to hook a tackle into the eye, might not notice that it was weak and defective. The verdict must stand.

*Motion and exceptions overruled.*