HOTELS EL RANCHO, INC., a Corporation, Et Al., Appellants, *v.* NEVADA PRAY, Respondent.

No. 3471

December 10, 1947.                    187 P.2d 568.

592

See, also, 64 Nev. 22, 176 P.2d 236.

*Leo A. McNamee* and *George Rudiak,* both of Las Vegas, for Appellants.

*Lewis & Hawkins,* of Las Vegas, for Respondent.

594

## OPINION

By the Court, HORSEY, J.:

For convenience, throughout this opinion the appellants will be referred to as defendants, and the respondent as plaintiff.

The above-entitled action was commenced February 7, 1946, by Nevada Pray, the plaintiff, against the above-named defendants, to recover damages for the death, by the alleged wrongful neglect of the defendants, of Carl Elvis Bales, the son of plaintiff and of one Orville D. Bales.

It is alleged in the complaint that the said Carl Elvis Bales was born February 29, 1932, in the city of Gary, Indiana, being of the age of about 16 years and 9 months at the time of his death. Plaintiff and the said Orville D. Bales, the boy's father, were divorced in the Eighth judicial district court of the State of Nevada, in and for the county of Clark, on the 12th day of December 1943, and the custody of the said minor child, Carl Elvis Bales, was awarded to his mother, the plaintiff herein, and he was continuously in her custody until his death, on the 25th day of November 1945, due, it is alleged in plaintiff's complaint, to the wrongful neglect of the defendants.

No question appears to have been raised in the lower court as to the right of the plaintiff to institute and maintain the action, as the surviving mother of the deceased.

The district court granted a motion for nonsuit as to the corporate defendant, Hotels El Rancho, Inc., a corporation (Tr. folios 613–615). The case came to trial before a jury in the said district court, May 6, 1946, the Hon. A. S. Henderson, district judge, presiding. The trial was completed, and the verdict of the jury rendered and entered, May 11, 1946, in favor of plaintiff and against the defendants, Hotel Last Frontier, a partnership, and the above-named individuals comprising same, and awarding to said plaintiff damages in the sum of

$8,000. On the said 11th day of May 1946, judgment upon said verdict was rendered and entered, in favor of plaintiff and against said partnership and individual defendants, that plaintiff have and recover said sum of $8,000, together with plaintiff's costs and disbursements, in the sum of $384.85. On June 1, 1946, the defendants moved for a new trial in the district court, upon the grounds stated in their notice of intention to move for a new trial (Tr., folios 1002-1006), which motion was argued, submitted, and, on said June 1, 1946, denied. It is from such judgment and the order denying defendant's motion for a new trial that the defendants, Hotel Last Frontier, a partnership, and the individual defendants comprising same, and above named in the title of the action, have appealed.

The district judge, at the trial, in the court's instruction No. 27, instructed the jury as follows:

"The jury is further instructed that it is alleged in the Complaint and admitted by the Answer, among other allegations and admissions set forth in said pleadings, that defendants, Hotel Last Frontier, a partnership, and William J. Moore, Jr., Ballard Barron, Harold Harris, Ted Jones, sued as Ted Janes, R. I. Payne, sued as R. J. Payne, Lynn Stocker, R. A. Higdon, sued as K. A. Higdon, Fred Morley, Fred Hoenscheidt, Jo Mattison Griffing, H. J. Griffith and H. J. Griffith, Trustee for Robert Earl Griffith, Jr., copartners associated in business under the fictitious name of Hotel Last Frontier, having decided to conduct a 'cross-country' race on the morning of November 25, 1945, over and upon certain unimproved sandy country lying immediately across highway 91 from said Hotel Last Frontier ground, over which premises and property they had theretofore conducted so-called treasure hunts on horse back, caused to be published in the Las Vegas Evening Review-Journal, a daily newspaper printed and circulated in Las Vegas, Nevada on November 21st and November 23d, 1945, notice that said cross-country race would be run on Sunday morning, November 25, 1945, over a

'½ mile switch back course' for prizes designated in said notice to be given to the first three contestants to complete said course and finish said race; that the notice so published as aforesaid informed the public that the persons desiring to enter such cross-country race should register at a time and place designated in said notice. That the said Carl Elvis Bales, minor son of plaintiff who was then a healthy normal child presented himself as a contestant on said November 25, 1945, and registered as an entrant in said cross-country race; that thereafter he lined up at the starting point with the other entrants as directed; that upon the signal to go being given, said Carl Elvis Bales rode his horse along the course pointed out by the defendants, Hotel Last Frontier, a partnership, and the individual defendants as partners.

"That the said minor child, while on said horse, in an effort to win said cross-country race rode his horse directly for the southerly point of the knoll around which from right to left the riders participating in said race were required to circle before completing said race. That while on said course, the horse then being ridden by the said Carl Elvis Bales, now deceased, fell and threw deceased to the ground so violently that deceased was rendered unconscious and so badly injured that said child died within a few minutes without regaining consciousness.

"And in that connection you are further instructed that as to all matters so alleged and admitted by the pleadings, no evidence need be given relative to such allegations and admissions."

In addition to the above-stated facts admitted by the pleadings, other facts having an important bearing upon the legal situation in the case are either conceded, in effect, by the arguments in the briefs, or are clearly established by the evidence. Among such facts are the following:

That on October 27, 1945, in connection with the Navy

Day celebration, a bombing demonstration was conducted near the Hotel Last Frontier, over and above the vacant land containing the course upon which the cross-country race involved in this case was run about a month later, on November 25, 1945; that numerous rocket missiles, or bombs, were, by the navy demonstrators, released and fired at a target consisting of a mound, or knoll, about one fourth of a mile east of the Hotel Last Frontier, which mound, or knoll, was the half way point of the "½ mile switch back course" over which the cross-country race was run, November 25, 1945; that as a result of said bombing demonstration, numerous of such bombs, or rocket missiles, fell to the ground near, and, principally, south and west of said knoll, or mound; that upon coming in contact with the ground, these rocket missiles generally exploded, and "churned or burrowed" their way into the ground, making holes, or depressions, therein, of various dimensions. These holes, or depressions, were numerous in the area adjacent to the mound, or knoll, mentioned. Matt Pray, the step-father of the deceased, Carl Elvis Bales, testified that he counted eight or ten of them. William J. Moore, Jr., the manager and director of the enterprise known as Hotel Last Frontier, and one of the defendants, testified, on that point, "Well, I'll say this—that the ground was rough as the devil," that there was hole after hole out there, "of every type." (Tr., folios 134–137).

Gustave Martin Granstrol testified, in effect, that such holes were "around two feet on the surface, and they funnelled down—2½ feet around and they funnelled down about two feet, and they were just the size of the rocket. They were filled in with dirt if the rocket wasn't there, like a long funnel" (Tr., fol. 479, 480).

The substance of William J. Moore's testimony is that although he knew of the navy demonstrations, October 27, 1945, and that, acceding to the request of the chamber of commerce, the public were invited to that

598

hotel to witness such demonstrations, and that bombs were dropped in the vicinity of the course proposed to be used for the cross-country race, he did not examine the course to see if it was safe to run horses thereon, until after the accident occurred, resulting in the Bales boy's death, November 25, 1945 (Tr., folios 108, 109).

Mr. Moore further testified that Miss Jerre Wyckoff was the employee of the hotel in charge of the conducting of the treasure hunt and cross-country race on November 25, 1945 (Tr., fol. 115). It appears from Mr. Moore's further testimony that he had never, prior to about ten days after the accident occurred, visited the course over which the races were conducted (Tr., folio 119).

Miss Geraldine Wyckoff testified, as a witness for defendants, that from July 1, 1943 (Tr., fol. 644), until the middle of March, 1946 (Tr., fol. 619), she had been employed by, and had resided at, the Hotel Last Frontier; that she had charge of publicity and advertising in connection with the treasure hunt and cross-country race held by defendants on November 25, 1945, and made the arrangements for such events, fixed the date, and wrote the copy for the advertisements (Tr., folios 624, 625); she testified further (Tr., folio 627), that she put the advertisements in the Las Vegas paper, and told those participating in the events what they were to do in conducting such races. Miss Wyckoff testified further that no races were conducted by the Last Frontier Hotel between February or March, 1945, and November 25, 1945 (Tr., folio 647).

Miss Wyckoff further testified that she knew about the demonstration of bombing, by the naval airplanes, on October 27, 1945; that she viewed the demonstration herself, "from in front of the hotel, standing on the porch there, a little driveway there" (Tr., folio 657). She further testified that prior to the time she went over the course with Mr. Gene Lowe, which was subsequent to the time of the cross-country race, which was run

November 25, 1945, she had never been over that course before (Tr., folio 660). The visit, with Mr. Lowe, to the scene of the accident occurred probably a week or two after the races were run, according to the testimony of the witness (Tr., fol. 662). It is, therefore, obvious Miss Wyckoff had never, prior to the time of such cross-country race, November 25, 1945, examined the course to see whether it was reasonably safe for such race. Miss Wyckoff also testified that she knew the mound, or knoll, at the half way point of such race course was the target for the navy bombardment, and that she saw the target (Tr., fol. 659) ; also, that she saw the bombs dropping over there (Tr., fol. 658). Miss Wyckoff testified, further, that when she went over the ground where the bombs fell, about a week or two after the cross-country race, she saw several holes around the south end of the knoll, or mound, which was the bombing target.

The testimony of Matt Pray in relation to the question of whether or not the Bales boy knew of the holes, or depressions, caused by the exploding bombs, was to the effect that the last time the boy had ridden the course prior to November 25, 1945, was approximately a year before, and that neither he (Pray) nor the boy had ridden the course in the year 1945, prior to the time of the cross-country race, November 25, 1945.

None of the testimony given at the trial indicates that the Bales boy visited the race course on the day of the bombing demonstration, or at any time thereafter and prior to his visit on the date of his death, or that he knew, or should have known, on November 25, 1945, of the presence of the bomb craters, or depressions, there, caused by the exploding rockets.

The theory of the plaintiff is that the accident which resulted in the death of Carl Elvis Bales was caused by the horse upon which he was riding in the cross-country race stepping into the hole, or bomb crater, found, after the accident, to be the one of such holes

situate nearest to the imprint of the fallen horse and to the place where the injured boy was lying very soon after the horse had fallen. The theory of the defendants is, in effect, that the physical facts in the near vicinity of where the horse fell are such as rendered impossible for the accident to have been caused by the Bales boy's horse stepping in the bomb depression, or hole, nearest to where the boy was found shortly after the accident; that the knowledge derived from experience as to falling horses, particularly as to where they will alight after tripping, or being thrown, precludes acceptance of plaintiff's theory.

Upon that phase of the case, the testimony of Matt Pray was, substantially, to the effect that when he saw the horse falling, he stopped his own horse as quick as he could, and rode back to where Carl Elvis Bales was lying; that he found the boy lying on the ground, bleeding badly, and gasping for breath (Tr., folios 162–165). In answer to the question as to what, if anything, out of the ordinary he saw about there, he answered (Tr., folio 165) : "There was a hole there about 20 feet from where he was lying." He then testified as to taking the boy to the hospital, and that he died there about 10 or 15 minutes after they reached the hospital. Further on in his testimony, Mr. Pray was asked about the hole nearest to where he found the injured boy lying, and, in response to the question, "How far was that hole from where the boy was lying when you got to him?" answered, "I would say twenty feet" (Tr., folio 173). Mr. Pray testified further, in substance (Tr., folios 173–178), that the hole was west of where the boy was lying; that said hole was approximately thirty feet from the knoll, or mound; that he had stepped the distance; that he took about ten steps, each "approximately 3 feet— 2½ anyway"; that on the next Tuesday after the Sunday upon which the accident occurred he examined the hole, and saw marks on it. Asked to describe what the marks were that made him conclude that the horse had stepped in there and fallen, Mr. Pray stated: "The

print of the horse was there where he fell." Questioned further, the witness stated: "Well, the sides of the hole showed where the sides had caved off." Asked, "Did you see any imprint on the ground beyond that hole?", the witness answered, "Yes, sir." Then asked what the imprint was, he answered: "The print of where the . horse had fell." Questioned further as to the size of that hole, Mr. Pray answered: "That hole was about 3 feet long, three and a half; two and a half feet wide and about two feet deep" (Tr., folio 180). The witness further testified (Tr., folio 182), in substance, that the hole was directly in the path, or in line, between the starting point of the cross-country race and the south end of the knoll. And, further on (Tr., folio 182), that he saw other holes near the south end of the knoll, and near the one concerning which he had testified as the hole nearest to where the boy was lying when he went to him immediately after the accident; that he counted eight or ten of them; that there were eight of such holes, approximately (he never stepped them), as near to the south end of the knoll as the one he had just described (the hole nearest the boy) ; that, looking north from the hole he had been talking about, he saw a hole, and measured it; that such hole was about $3\frac{1}{2}$ or 4 feet long, about 3 feet wide, and 2 or $2\frac{1}{2}$ feet deep; that that hole was approximately 35 feet from the hole nearest to where the boy was lying.

Lee Simpson, a witness on behalf of the plaintiff, testified, in part, substantially as follows: that he arrived at the Last Frontier Hotel about four or five minutes after the cross-country race, on November 25, 1945; that a fellow named "Tex" told him about the accident—he was riding Matt's (Matt Pray) horse, and they "went out to this particular spot, and looked it over"; that he "went out to near a sand dune where there was a hole, east of the Hotel Last Frontier, there"; that he had ridden in some of the stake races conducted under the auspices of the Hotel Last Frontier, over the same ground he went over that day (November 25, 1945) ; that he had

ridden in one that took him over near the knoll, or sand dune, which was the half-way, or turning, point of the cross-country race, November 25, 1945; when he so rode (presumably in a treasure hunt), they would get off their horses, and search around for stakes; that he had moved along on foot near the south end of the knoll—and had "been over all that both horseback and on foot"; that the witness never, prior to the 25th of November, 1945, saw the hole that he saw there that day; that he did not take any measurements of the hole to ascertain its size (Tr., folio 282), "just went up and looked down in the hole to see what happened, because I could see where a horse had fell and I wanted to see, naturally, what caused it. That's what I looked for." When he looked down into that hole, he saw "the bottom of the hole was all torn up; the dirt in the bottom of the hole was fresh—torn up." Asked if it had been freshly disturbed, if that was what he meant, the witness answered: "That's right." The witness further testified, as to the size of the hole, "well, it was two or three feet, externally, and seemed to me like it was a little bit longer one way than it was the other"—that he imagined it was "somewhere around three feet, the long way"; across the other way "it was two or a little better, it seemed to me like; the sand in the bottom of the hole looked to me about 18 inches deep. That was my opinion."; "* * * 18 inches down to the loose dirt, is what I figured." The witness testified, further, that he "seen the imprint of—kind of imprint of a horse where he scrambled getting up, and falling together, and the blood where the boy had been crushed"; that the imprint "was right there by the side of it" (where the boy had been crushed), "and right around, you might say." Asked how far away he would say the imprint of the body of the horse was from that hole, the witness answered: "It must have been 15 or 18 feet, something like that." Asked whether he knew what the general condition of the ground immediately around that hole

was, with reference to whether or not it was "brushy," the witness answered:

"A. Well, there is not too much brush there around that thing, maybe a little bit of that is sagebrush.

"Q. About how far? A. There on the south and east there is some of that greasewood out there. I saw it.

"Q. How far is that from the hole, do you think? A. The biggest part of it would be 50 to 100 feet, somewhere around there, from the hole out to the side." (Tr., folios 283–287).

LaVerne Allen, a witness on behalf of the defendants, testified, in part, substantially as follows: That witness was one of the riders in the cross-country race, November 25, 1945; that he was approximately 25 feet behind Carl Elvis Bales, and 6 feet to the side of him, when the horse fell; that he saw Bales when his horse fell; he saw the horse's head go down, and there was a lot of dust, and then the horse got up on a run (Tr., folios 745–747); that witness and Buck Ackley were the first to reach the place where the injured boy was lying; that he saw Carl lying on the ground, at the time he approached where Carl fell; that part of Carl's head was pushed into the sand (Tr., folio 749); that there was no hole within ten feet, either direction, of where the boy had fallen (Tr., folio 751); that, with Mr. Rudiak and Mr. McNamee, he visited the scene of the accident the day before he testified (Tr., folio 754); that witness saw a hole in the vicinity of the blood spot, about 30 feet from the position of the blood; that he knew it was 30 feet, because he paced it off—that every two steps averaged five feet; that he did not see that hole on the day of the accident (Tr., folios 756–758). The witness was asked whether he had ever seen any small sand dunes or "rises" in the ground, created by sand having blown about a bit of desert vegetation, or desert brush, or something of that sort, and answered, "I have"; that in his opinion, as an expert horseman, that

sometimes constitutes a hazard to a man on horseback; that he had been thrown from a horse as a result of the horse tripping over such a "rise" in the ground (Tr., folio 764) ; that there were small mounds of that character in the immediate vicinity of where the boy had fallen—there were five or six; "there was one or two straight in front of from where the boy had fallen" (Tr., folios 765, 766) ; there was one in particular that was a little to the south and straight west, ten feet, or close to ten feet, west of the spot of blood (Tr., folios 768–769).

Delbert Allen, a witness for defendants, testified, among other things, that he was a participant in the cross-country race, November 25, 1945; he saw the horse fall, with the boy on it; that when the horse went down and turned over, his feet were in the air, when witness passed him; that witness was right across from him, 7 or 8 feet; that witness just kept going, that is, he continued in the horse race (Tr., folios 838–840). Asked if he knew what the average length of a horse is, between his hind legs and his front legs, the witness answered: "Some are longer than others, but the gross of most of them is six feet between the hind legs and fore legs" (Tr., folios 841, 842). That the witness visited the scene of the accident on the day he was testifying; that upon the visit that day he identified the place where he saw the horse fall, by the fact that they found some dry blood where the boy was found (Tr., folio 856). The witness was then asked:

"Q. And will you state again, please, what the distance was between the spot where you found the dry blood and the spot where you found a hole, which hole is indicated by the letter 'D'?" (Upon a drawing on the blackboard at the trial.) A. By stepping it off, it would be around 35 feet."

The witness further testified, when asked if he recalled having seen a hole on November 25, 1945, in the location indicated on the drawing as letter "D"; "I don't

remember—I was traveling too fast. I wasn't paying attention to a hole." (Tr., fol. 857.) Asked if he observed anything else in the immediate vicinity of the spot where he found the dry blood, the witness answered: "Yes, there was a little knoll 12 feet away from where the blood was" (Tr., folio 858) * * * "twelve feet by stepping it off"; that the little knoll "is just a little brush with a bunch of dirt around it"; that the knoll was two feet wide and eight inches high at the highest point; that, in the vicinity where the dry blood was found, the witness observed other mounds of a similar character, on the sides, that is, in a northerly and southerly direction from the mound marked "E" on the blackboard drawing (Tr., folios 859, 860).

Before proceeding to treat the controversial issues involved in the instant case, we will set forth certain legal principles which, it is believed, are applicable in the premises.

Defendants, in connection with their discussion, in their opening brief, of the extent of the duty of an owner or occupant of land to an invitee, under various circumstances, have presented, and quoted (opening brief, pp. 10, 11) the rule as stated in 38 Am.Jur., p. 754, as follows:

"The rule is that an owner or occupant of lands or buildings, who directly or impliedly invites others to enter for some purpose of interest or advantage to him, owes to such person a duty to use ordinary care to have his premises in a reasonably safe condition for use in a manner consistent with the purpose of invitation, or at least not to lead them into a dangerous trap or to expose them to an unreasonable risk, but to give them adequate and timely notice and warning of latent or concealed perils which are known to him but not to them. * * * There is no liability for injuries from dangers that are obvious, reasonably apparent, or as well known to the person injured as they are to the owner or occupant."

■ The United States supreme court, in the opinion by a very learned and able jurist, Mr. Justice Harlan, in the case of Bennett v. Louisville & N. R. Co., 102 U.S. 577, 26 L.Ed. 235, on page 236, has presented, and stated, the rule, as follows:

"The facts disclosed by the pleadings, and by the demurrer conceded to exist, seem to bring this case within the rule, founded in justice and necessity and illustrated in many adjudged cases in the American courts, that the owner or occupant of land who, by *invitation,* either express or implied, induces or leads others to come upon his premises, for any lawful purpose, is liable in damages to such persons, they using due care, for injuries occasioned by the unsafe condition of the land or its approaches, if such condition was known to him and not to them, and was negligently suffered to exist, without timely notice to the public or to those who were likely to act upon such invitation. New Orleans, M. & C. R. Co. v. Hanning, 15 Wall. 649, 82 U.S. 649, 21 L.Ed. 220; Carleton v. Franconia Iron & Steel Co., 99 Mass. 216; Sweeney v. Old Colony & N. R. Co., 10 Allen, Mass., 368, 87 Am.Dec. 644; Whart., Negl., secs. 349–352; Cooley, Torts, 604–607, and authorities cited by those authors. The last named author says that when one 'Expressly or by implication invites others to come upon his premises, whether for business or for any other purpose, it is his duty to be reasonably sure that he is not inviting them into danger, and to that end he must exercise ordinary care and prudence to render the premises reasonably safe for the visit.'"

In the opinion, the learned justice then stated: "The rule is also illustrated in many cases in the English courts, some of which it may be well to examine," and then proceeded to present, discuss and quote from many of the English cases elucidating and applying the rule to the particular facts and circumstances existing in those cases.

This court, in the case of Nevada Transfer & Warehouse Co. v. Peterson, 60 Nev. 87, 90, on pages 98, 99,

89 P.2d 8, 99 P.2d 633, on page 637, in the opinion, by Mr. Justice Ducker, stated:

"The condition was known to Ginnochio, and it was negligence on his part to direct her to go there without warning her of the danger in her path. The general rule applicable here is well expressed in 45 C.J. p. 875, as follows: 'If the owner of land knows that its condition is unsafe he should give timely warning to persons rightfully there. More specifically, an owner or occupant of lands or buildings who knows, or in the exercise of reasonable care should know, of their dangerous and unsafe condition and who invites others to enter upon the property owes to such invitees a duty to warn them of the danger, where the peril is hidden, latent, or concealed or the invitees are without knowledge thereof.' "

■ In arguing as to the extent of the duty which defendants owed the deceased, Carl Elvis Bales, in connection with his participation in the cross-country race, November 25, 1945, defendants question the contention of plaintiff that the deceased was an invitee, or business visitor, in the sense requiring defendants to exercise ordinary care that the property he was invited to enter was in reasonably safe condition for the purpose of the invitation. Defendants contend, in effect, that inasmuch as the defendants had no permanent status as occupants of the premises involved, defendants were, to the extent of their use of the premises for the races, November 25, 1945, trespassers as against the true owner of the property, and that the deceased, Carl Elvis Bales, by his participating in such use of the property, was also a trespasser. We do not believe this would affect the duty of defendants to rectify, or at least warn against, any latent defects in the condition of the portion of the property upon which the cross-country race was to be run. The defendants used the premises without interference from the owner, and had done so previously, as to other races. Their use for the particular purpose mentioned was to the same extent as though they had owned or leased the property, or, at least, had a license or agreement from

the owner permitting them to conduct the treasure hunt and cross-country race thereon, on the date mentioned. By virtue of defendants' advertisements, in the Las Vegas Evening Review-Journal, of the intended treasure hunt and the cross-country race, to occur November 25, 1945, inviting qualified persons to become participants in such races, those reading such advertisements, and, pursuant to the invitation thereby extended, becoming participants therein, had the right .to assume that the defendants possessed the right to conduct such races over the course indicated in the advertisements. It would seem that this would be especially so as to invitees who had participated previously in any race, or races, or treasure hunt, over the same course, at the invitation of the defendants. A participant in such race, or races, in response to such an invitation, would not be burdened with the duty of ascertaining whether or not the invitor was an owner, lessee, licensee, or a mere trespasser. Such a burden would not be to the benefit of the invitor, as it would, undoubtedly, so discourage participants as to seriously endanger the ability to make the events successful.

■ The plaintiff has, as to this question, cited and quoted the following from 45 C.J., sec. 246, p. 838:

"One who invites others on to property of which he is in apparent possession owes to them a duty to keep the property in safe condition, even though his occupancy of the property is a trespass as against the true owner."

Defendants have, also, in their opening brief, argued to the effect that they derived no direct pecuniary benefit from the cross-country race in which Carl Elvis Bales participated; that they sponsored such events at the instance of the horsemen of the community, and racing enthusiasts generally, in order to promote and enhance, in that locality, the restoration of the early western atmosphere; that same, as an added attraction to tourists, was mainly for the benefit of the community, and

for the benefit of defendants only incidentally, in perhaps bringing them a few more guests, or patrons, at the time of the races.

■ The authoritative statements of the rule defining the duty of those inviting others upon property owned or occupied by the former for a particular purpose, do not confine such purpose to one of pecuniary profit to the invitor. In the statement of the rule by the United States Supreme Court, in Bennett v. Louisville & N. R. Co., supra, the words "for any lawful purpose" are employed by Mr. Justice Harlan, in the portion of the statement of which he was the author; and same is immediately followed by a quotation from Cooley, Torts, 604–607, in which the great jurist and law teacher, Judge Cooley, used the words "whether for business or for any other purpose," in his statement of the rule hereinabove quoted more fully.

In 45 C.J., p. 875, in the statement of the rule, quoted with approval by Mr. Justice DUCKER in Nevada Transfer & Warehouse Co. v. Peterson, supra, there is no express mention, at all, of the purpose of the invitation—merely the clause, "and who invites others to enter upon the property owes to such others the duty to warn them of the danger," etc.

■ The statement of the rule in 38 Am.Jur., sec. 96, p. 754, quoted in part by defendants in their opening brief, pp. 10, 11, as hereinbefore set out, does contain the phrase, "for some purpose of interest or advantage to him." But we do not interpret this phrase to mean that the "interest or advantage" to the invitor, to be derived by him from the carrying out of the purpose of the invitation, must, necessarily, be pecuniary. Any substantial or appreciable interest or advantage, whether pecuniary, recreational, educational, charitable, spiritual, or otherwise, which an owner or occupant considers sufficient incentive to cause him to plan and purpose public gatherings, assemblages, exercises, exhibitions, or other events, and to invite others to participate therein,

upon premises owned or occupied by him, in order to carry out such plan or purpose, is sufficient, we believe, to justify imposing upon the invitor the duty of employing ordinary or reasonable care that such property shall be reasonably safe for use in carrying out the purpose of the invitation. The one extending the invitation should be the judge of the interest or advantage to him of that which he sponsors, and in which he invites the participation of others. The fact that he invites their participation should be sufficient assurance to them that he has determined that the affair, or event, in which they are invited to participate is of sufficient interest or advantage to him to justify his assuming the responsibility of employing ordinary or reasonable care to have the property or premises upon which the affair, or event, is to take place, in reasonably safe condition therefor.

Be that as it may, it is abundantly clear from the authorities that, even if the expectation of pecuniary profit may be considered an essential condition to the imposition of the duty of ordinary or reasonable care to have the premises reasonably safe for the intended purpose, or, at least, to warn the invitees of any latent defects therein, such expectation need not be of *immediate* pecuniary advantage.

In the same section 96, quoted in part by defendants, and by us, there is this further sentence, on page 756 (38 Am.Jur.) :

"The fact, however, that pecuniary profit was not expected by the owner or occupant to accrue immediately from the entry of one whom he invites to come upon the premises does not affect his liability to such person." Citing Leighton v. Dean, 117 Me. 40, 102 A. 565, L.R.A. 1918B, 922.

██ The slogan of the Hotel Last. Frontier, as disclosed by the evidence, is, "Early West in Modern Splendor." The hotel management features this slogan in their extensive advertising, and the racing events they sponsor are features of the early western atmosphere

promised by this slogan, such events being not only calculated to attract guests directly, but, also, to publicize through those who have witnessed them that the environment of this resort hotel, in reality, *has* the early western atmosphere which it has been represented to have. Such atmosphere, or environment, and all that contributes to it, including the racing features, are intended, of course, for the purpose of increasing the attractiveness of the hotel to tourists, and so, thereby, materially contributing to the long-range expansion of the business, with its consequent increase in pecuniary benefits. There is no merit to the idea advanced by defendants that the principal purpose of the races. of November 25, 1945, was not that of pecuniary profit.

The defendants have argued that the very nature of the risks assumed by the deceased, Carl Elvis Bales, in entering the cross-country race was one of hazard—that his horse might trip and fall, and throw its rider, as a result of the rough character of the terrain.

■ One entering into and participating in a cross-country race does assume the risk of injury from the *natural* hazards necessarily incident to, or which inhere in, such a race. To the extent of natural hazards, the maxim, "volenti non fit injuria" applies, which, translated, means, "that to which a person assents is not esteemed in law an injury." The doctrine, or principle, is stated in 38 Am.Jur. 845, as follows:

"One who knows, appreciates and deliberately exposes himself to a danger 'assumes the risk' thereof."

■ The natural hazards which the invited participant in a cross-country race may be properly assumed to know and appreciate, in the absence of evidence of actual knowledge thereof, are those which usually are the accompaniment of such a race, such as natural gulleys, natural water-ways or depressions in the surface of the terrain caused by action of the elements, rocky or sandy elevations, bushes and other vegetation growing on the surface, etc. But the participant in such a race

is deemed to assume the risk only of such *natural, ordinary hazards, and not of extraordinary hazards or dangers artificially created,* unless such artificially created hazards are known to such invitee before he enters the race, and he voluntarily assumes the risk thereof. 45 C.J. 837.

Such hidden dangers as pitfalls, traps, shafts, holes (so situated as to be partially hidden or obscured), and other excavations artificially created, and the presence of which is known, or by the use of reasonable care should be known, to the owner or occupant, and which are not known to the invitee, or would not be observed by him by the use of ordinary care, do not come within the operation of the doctrine of assumption of risk, nor of the doctrine expressed by the maxim, "volenti non fit injuria."

It cannot fairly be held, therefore, that the dangers arising from holes or depressions in the course of the cross-country race conducted by the defendants, November 25, 1945, and which were testified to at the trial, by numerous witnesses, as having been produced by the navy day bombardment, were any part of the *normal or ordinary* risks which inhere in, or are incident to such a race.

Even though a certain hole, artificially created, may not be more dangerous than some obstruction or danger *naturally* created, it is only the *natural, ordinary* hazards which the law deems the invitee in such a race to have assumed, in the absence of evidence of voluntary assumption of *extraordinary* risks. To impose upon the invitee such *added* risk from dangers unknown to him is unwarranted in the law upon any theory that such dangers, considered individually, may be no greater than certain individual hazards naturally created. The obvious truth is that, in the absence of knowledge of perils not ordinarily incident to a cross-country race, but artificially created, the invitee has the right to rely upon the assurance that the owner or occupant of the land, who has

invited him to participate in the race, will exercise reasonable or ordinary care, by examinations or inspection of the premises to learn of the condition of the same for use in accordance with the purpose of the invitation, and that such owner or occupant will either rectify hidden defects, or those which are not readily observable to one in the situation of the invitee, or that he will, at least, give timely warning of their presence.

The defendants, most earnestly, contend that the presence of the holes or depressions in the near vicinity of the mound or sand dune which was the half-way point of the cross-country race, and in the line of the course of the race, was so obvious, to one using ordinary care for his own safety, that no duty devolved upon defendants even to warn the participants in such race, including the deceased, Carl Elvis Bales, of such danger, or to take other steps to remedy the same. Defendants, in their opening brief, page 10, have cited numerous cases in support of their contention, and we have carefully considered them, and will now refer to some of those authorities.

Hill v. Eaton et al., 65 Cal.App.2d 11, 149 P.2d 762, 764, was an action brought by plaintiff therein, a roofer employee of a subcontractor, against a general contractor, for injuries sustained by the plaintiff from falling through an open skylight in the roof of the structure upon which he was working, as such roofer. A judgment of nonsuit was affirmed, upon the ground that "the open skylights were obvious; they were not hidden in any way, and plaintiff was an experienced roofer, fully aware of their existence." That case is readily and clearly distinguishable from the instant case. In the former, the plaintiff was an experienced roofer, and his occupation necessarily brought him in contact with open skylights frequently. Their presence, from time to time, was a patent danger, readily observable, particularly to one experienced as a roofer, whose very occupation had undoubtedly taught him to expect their

presence. Being an ordinary incident of his occupation, he would properly be deemed, in the absence of extraordinary conditions of danger, to have assumed the risk of any injuries which might result from the presence of such skylights. Besides, his ordinary work did not require him to approach the skylights hastily, without time or opportunity for observation, but in the usual leisurely manner of such workmen. To one in his situation, the danger *was* clearly obvious.

■ On the other hand, the danger to Carl Elvis Bales, from the holes made by the bombing, was not one naturally incident to his occupation, for which experience had fitted him; nor was it a danger inhering in, or incident to, a cross-country race, and which he could be deemed to have anticipated. Instead, it was an *extraordinary danger, artificially created,* which, by the use of ordinary diligence, the invitor had ample opportunity to know about (having known that the bombing had occurred), and to warn of its presence, to participants in the cross-country race. Those participating in the race had no advance knowledge sufficient to put them on notice of the probable effect of the bombing as to creating such holes, and, without such knowledge, owed no duty, to themselves or others, to inspect, in advance of the races, the ground over which they were to be run. Without any such inspection, or prior warning, the participants in the cross-country race, including the Bales boy, had no opportunity to learn of the presence of the holes, except, perchance, by discovering their presence, in the excitement and haste of the race, in time to enable them to avoid the danger. As to those in the situation of the Bales boy, with so limited an opportunity, under such unfavorable circumstances, to observe the holes made by the bombing, it cannot justly, or reasonably, be concluded that the hazardous condition of the ground was sufficiently observable to those in such situation as to be patent or obvious, within the legal meaning of those terms.

In King v. Griffith Co., 65 Cal.App.2d 114, 150 P.2d

8, the plaintiff, an employee of a roofing subcontractor engaged in the construction of Camp Manzanar, suffered injuries when the edge of a sewer ditch excavated upon the premises caved in as the plaintiff was about to cross the same. Plaintiff sued the excavation subcontractor and the general contractor. Judgment of nonsuit was affirmed upon appeal. From the court's opinion, quoted in part in defendant's opening brief, pages 12 and 13, it is apparent that the facts of that case and those of the instant case are so different that the one cannot be deemed authority as to the other. We quote from the court's opinion, pages 9 and 10 of 150 P.2d.

"Plaintiff had crossed the ditch which had been dug by defendants on a number of occasions. The accident occurred at about ten o'clock in the morning and the ditch was plainly visible. Plaintiff knew that others had crossed just ahead of him and for this reason could take particular notice of the soil to see if it had become loose or in danger of falling upon repeated crossings. Indeed, it can well be argued that plaintiff was in even a better position than defendants to know whether the ditch was then in an unsafe condition. Rather than walk to the end of the ditch or to take the time to throw in dirt to make a better crossing, plaintiff chose to step across the ditch, following Dressel, who had crossed immediately ahead of him. In doing so he assumed the risk of making the crossing."

No fault can properly be found with that opinion; but because of the vast difference in the factual situation in King v. Griffith Co., supra, from that in the instant case, the statements above quoted have little value as authority in the instant case, because not applicable to the factual situation in the latter. The consideration of the factors involved in King v. Griffith Co. does, however, serve to emphasize and make clear, by way of comparison and contrast, the absence in the instant case of important factors which in King v. Griffith Co. relieved from liability. Unlike the plaintiff in King v. Griffith Co., supra, as to the ditch, Carl Elvis Bales did not know

616

of the existence, on the premises where the cross-country race was to take place, of the holes caused by the bombing. And, of course, one in his situation had no opportunity to observe others crossing such depressions or holes, so as to know whether crossing them could be safely accomplished, or whether he should direct his horse around them. The plaintiff in King v. Griffith Co., supra, had an equal, or better, opportunity to observe the condition of the ditch, and the sides thereof, than the defendant in that case. He was not approaching the ditch on horseback in a speed race, with his full effort required in guiding his horse, and with no previous knowledge of a dangerous excavation, but leisurely, with full knowledge of the existence of the ditch, and ample opportunity to observe its then present condition. Young Bales, on the other hand, as above stated, had no knowledge of the holes made by the bombing; his full attention was required by the necessities of the race; and there was no reasonable probability that one in his situation, approaching with racing speed and with no markers having been placed to direct his attention to the holes, would be able to detect a hole or depression about 3 or 3½ feet long, 2 or 2½ feet wide and about 18 inches deep, until too near to such hole to enable him to rein his horse around it, or to avoid the risk of his horse attempting to jump across the same. The evidence does not disclose the features of the terrain, in the vicinity of the hole nearest to where the Bales boy was found, sufficiently to disclose just how near to the said hole a horseman traveling over the course of such race would have to be in order for the hole to come within his observation. The topography of the country there would be material. If the approach to the hole, on that course, of one riding from the west eastward toward such mound or knoll, was slightly uphill, a horseman of average height, upon a horse whose height was also average, would probably have to approach very near the hole to be able to observe it. Under such circumstances, especially in the case of a horseman traveling with great

speed, the fact of the presence of the hole would be precipitately thrust upon his consciousness, as it suddently loomed before his vision. There is no similarity between such approach as occurred in the instant case and the leisurely approach in King v. Griffith Co., supra, to the place where the accident occurred. In the King case, there was ample opportunity for unhurried and deliberate choice as to the course to be pursued. In the instant case, there was no such opportunity.

Shanley v. American Olive Co., 185 Cal. 552, 197 P. 793, cited by defendants in their opening briefs, is a case in which the danger was clearly obvious to one in the situation of the plaintiff therein. Such plaintiff was a railroad brakeman, taking part in switching operations. There was a building so close to the track that there was only a few inches of space between the outside of the freight car, upon which plaintiff was riding, and the side of the building—not sufficient to allow plaintiff to be on the ladder outside the car without coming in contact with the building. He did attempt to climb the ladder, as the car upon which he then was approaching the building, although the position of the building in relation to the track was clearly visible to him. He was caught between the ladder and the building, and seriously crushed and injured. The court properly held that the danger was plainly obvious, and that plaintiff had assumed the risk, with knowledge of the danger.

Even if the ground over which the participants raced their horses, November 25, 1945, contained no slope upward as young Bales approached, from the west traveling east, the hole nearest where his body was found, but if such ground was entirely level, even then it is problematical how near one speeding on horseback in a race would have to be before it could be said with any reasonable certainty that a hole of the size of that hole would become visible to him, presuming, as we must, in the absence of any evidence to the contrary, that he was employing ordinary care for his own safety. Unlike an object extending above the surface of the

earth, or, if resting upon such surface, possessing form or color, as a bed of flowers, which would attract the eye and set it apart from the surrounding terrain, such a hole, or depression, would be a mere vacuum, possessing no contrast in form or color to distinguish it from the surrounding terrain. It does not reasonably appear to us that such hole, or vacuum, intruding upon the continuity of the surface of the terrain, would be observable to one in the situation young Bales was in at the time he approached the hole at racing speed, with his mental faculties naturally concentrated upon guiding and encouraging his horse onward, in the endeavor to win the race, until he was very near to the hole—too near, in fact, to enable him to do other than trust his horse to jump the hole. If the horse and rider did thus approach the hole under those circumstances, and the theory of the plaintiff is true, that the horse stepped into the hole, lost his balance and footing, and turned a complete somersault, throwing young Bales, and/or falling upon him with such force that he suffered injuries which caused his death, it is clear that the failure of the defendants to use ordinary or reasonable care, before the race, in order to assure the invitees in the race a reasonably safe place for the purpose thereof, constituted negligence, and that such negligence was the proximate cause of the injury and death of Carl Elvis Bales. Defendants could have performed their duty, either by having the holes filled in, by placing markers marking out a course which would avoid such holes, and instructing the participants, clearly, to follow the new course thus marked out, or, perhaps, by clearly warning such participants of the character and approximate location of the holes. But the defendants did not take either, or any, of these precautions. The testimony of both Mr. Moore, general manager of the partnership then operating the Hotel Last Frontier, and of Miss Jerre Wyckoff, clearly establishes the utter absence, on the part of the defendants, of the exercise of reasonable, ordinary care, or any care

at all, to provide the invitees a reasonably safe place for the cross-country race.

We cannot accept the view that the sponsors of such a race as the cross-country race of November 25, 1945, owed no duty of prior inspection of the ground because of the theory that such a race involved the presence of perilous conditions. Suppose there had been a shaft, or well, dug upon that part of the premises constituting the race course, subsequent to the races in the spring of 1945. Under defendant's theory, they would have owed no duty to discover and warn of such shaft, or well, even though one participating in the later races and traveling from west to east toward the target mound, or knoll, would not be able to see same if such excavation were uphill when the rider was approaching, or was situated behind some mound or knoll sufficiently high to obscure vision. Under defendants' theory, defendants owed no duty to discover the presence of the shaft or well or other excavation, or to give any warning thereof to participants in the races, because, to some slight extent under favorable circumstances, such excavations may have been obvious; nevertheless, the legislature of Nevada, in 1866, declared such open excavations to be dangerous, when they enacted a statute requiring fencing them, which is still the law of this state, Statutes of Nevada 1866, p. 59, N.C.L.1929, vol. 2, secs. 5630–5635.

The terms "ordinary care" and "reasonable care," when used in connection with the duty of an owner or occupant of land or buildings, to his invitees thereon for a particular purpose, are terms which, by the weight of authority, are deemed synonymous and interchangeable. 45 C.J. p. 682, sec. 51; Canadian Northern R. Co. v. Senske, 8 Cir., 201 F. 637, 642, 120 C.C.A. 65; Goodwyn v. Central of Georgia R. Co., 2 Ga. App. 470, 58 S.E. 688; Caven v. Bodwell Granite Co., 99 Me. 278, 59 A. 285; Colsch v. Chicago, etc. R. Co., 149 Iowa 176, 127 N.W. 198, 34 L.R.A.,N.S., 1013, Ann. Cas.1912C, 915.

From the foregoing discussion of the element of obviousness, it is apparent that it is our view that the holes or depressions which resulted from the bombing demonstration held October 27, 1945, were not sufficiently patent or obvious to one in young Bales' situation to relieve defendants to the duty to employ reasonable or ordinary care to ascertain the presence of the holes, and, at least, to warn the participants in the race of the danger resulting therefrom. The failure so to do constituted negligence on the part of defendants.

But was the deceased, Carl Elvis Bales, contributorily negligent? In determining this question, it should be borne in mind that the deceased, Bales, had ridden in the treasure hunts conducted by said hotel, either in the spring of 1945 or in the fall of 1944, or both. The evidence is uncertain as to how many times, or when, he had thus participated, but that he had ridden his horse in such races, over the same course as that used November 25, 1945, at times previous to said last-mentioned date, there can be no doubt. The holes produced by the bombing were not there at the time of the previous races, and, in the absence of evidence to the contrary, we must assume that the ground over which such prior races occurred was free from defects or dangers other than those arising from the natural characteristics of the terrain. Bales' former experience as to the reasonable safety of the ground, coupled with his knowledge that the Hotel Last Frontier management were sponsoring the races of November 25, 1945, reasonably were calculated to make him feel secure, and to prevent the formation in his mind of any realization that it was necessary to be alert to discover unusual and extraordinary conditions of danger not readily observable. He, naturally, therefore, being unapprehensive of the existence of any conditions other than those ordinarily incident to a cross-country race, devoted his attention and effort to winning the race. As said before, in effect, in dealing with the question of obviousness, we do not

consider it reasonably probable, or likely, that the Bales boy, by the exercise of reasonable or ordinary care would have been able, in view of his situation and the surrounding circumstances in which he was placed just prior to the accident, to have seen the hole or depression nearest where he was found after being injured, in time to afford him a fair and reasonable opportunity to safely guide his horse around the hole, and avoid the horse stepping therein, and the consequent tragic result.

Contributory negligence is a defense as to which the burden of proof rests upon the defendants. The jury was properly instructed as to the law applicable to such defense, and their verdict imports a finding against defendants upon that issue. We cannot say, as a matter of law, that the finding of the jurors was erroneous, or that same was not supported by the evidence. Neither can we say that the verdict was contrary to the law, or that the defendants were entitled to a new trial upon that issue.

We must now consider the contention of the defendants that whilst they concede the rule is that it is the province of the jury to determine the facts, and, in the event of a conflict in the evidence, the verdict and judgment thereon should be upheld by this court if there is substantial evidence to support it, nevertheless, as they contend, such judgment and verdict in the instant case cannot be sustained, because it would have been physically impossible for the accident to have happened in accordance with the theory of the plaintiff, to the effect that the horse was caused to fall by stepping in the hole or depression nearest to where the injured boy was found. On pages 3 and 4 of defendants' (appellants') reply brief, their contention on that point is stated as follows:

"So, the entire testimony of the respondents' witnesses on this major point is a pyramid of conjectures and conclusions. And we have argued at length in our opening brief (pages 29–35) that these conclusions must break

down of their own weight because they contradict the known physical facts about falling horses, of which the Court may take judicial cognizance. Houska v. Hrabe, 35 S.D. 269, 151 N.W. 1021, L.R.A.1915D, 1074. Every person of ordinary intelligence knows that a horse stumbling and falling at full gallop does not strike the ground twenty feet beyond the point of stumbling, as Matt Pray contends, or fifteen to eighteen feet, as Lee Simpson would have us believe. And the Court may take judicial cognizance of matters of common knowledge known to all persons of ordinary intelligence. 23 Corpus Juris 59, sec. 1810.

"How much more consistent with the facts as developed by the testimony of the respondents' own witnesses is the hypothesis suggested by the testimony of La Verne Allen, a witness on behalf of appellants, who testified to the existence of several small mounds of wind-blown sand approximately ten feet from the blood spot and in the direct line of the race between the blood spot and the starting point. (Folios 764–769.) According to the testimony of this witness, testifying as an expert horseman, mounds of this character are sometimes hazardous to a man on horseback, the witness having himself previously been thrown from a horse tripping over such a mound. This is what the respondent, at page 4, line 30 of her answering brief, has chosen to call 'only an ingenius theory, supported by no evidence,' although on page 3, line 7 of her brief she admits that 'appellants offered some testimony' of the possibility that the horse of the deceased may have stumbled over such a sand mound."

It may be noted that La Verne Allen testified that the small mound, or knoll, to which he referred was approximately ten feet from the blood spot, where the injured boy fell (Tr., folios 764–769), whilst his brother, Delbert Allen, testified same was 12 feet therefrom. Delbert said he determined the distance by stepping it off. Asked to describe the appearance of the mound, or knoll he stated it was "just a little brush with a bunch of

dirt around it," that it was approximately 2 feet wide and 8 inches high at the highest point (Tr. folio 852, also 858, 859). Although Delbert Allen testified that it was 35 feet from the blood spot, where the boy was found, to the hole that had been testified to by plaintiff's witnesses as the nearest hole to that point, defendants, in their reply brief, on page 4, above quoted, adopted the distance of "20 feet" (as Matt Pray testified), or "15 to 18 feet" (as Lee Simpson testified), for the purpose of their argument, and not the distance of 35 feet, as testified to by Delbert Allen.

It does not appear, from the record, that any of the witnesses attempted to make exact measurements of this distance. They merely "stepped it off," which probably accounts for the great variances in the testimony. We have not before us, nor had the jurors at the trial, any evidence from which it may be concluded, with reasonable certainty or accuracy, what the distance actually was between those two points, that is to say, between the blood spot, or the imprint of the horse near by, and such hole nearest thereto, and we have no means of knowing precisely what the jury concluded the distance to be. The jurors may have accepted, as preferable, the testimony of Lee Simpson, a disinterested witness, and they had the right to do so, if they believed it, for, upon the trial, they were the sole judges of the facts. If the distance, therefore, was "15 to 18 feet," as Simpson testified, his minimum distance of 15 feet between the blood spot, or the near-by horse's imprint, and the hole would be only 3 feet more than 12 feet which Delbert Allen testified was the distance between the blood spot, marking the place where the injured boy was found, and the little knoll or mound, surrounded by wind-blown sand. If, as contended by defendants, the Bales boy's horse fell because of tripping over the little knoll, resulting in the injury and death of the boy, and the body of the horse was of the average length of 6 feet between the hind legs and the fore legs (such being the average testified to by Delbert Allen), the horse, after turning

the somersault, allowing 6 feet for its length, would, in some manner, have had to have glided, or been propelled, through the air a distance of about 6 feet. But if, as contended by plaintiff, the horse fell because of having stepped in the hole, and the distance was 15 feet, the minimum estimated by Simpson between the hole and the imprint of the horse on the ground, or the blood spot near by, the horse, allowing the average of 6 feet for its length, would have had to have glided, or been propelled, forward a distance of 9 feet. Defendants contend that the known physical facts as to falling horses show this latter to have been impossible. The writer of this opinion has read the case of Houska v. Hrabe, 35 S.D. 269, 151 N.W. 1021, L.R.A.1915D, 1074, cited by defendants in that connection. That was a case in which the alleged cause of action was one based upon an injury having occurred to a mare colt, from having·been caught in a wire fence while playing, or romping, etc., with horses of the defendant on the other side of the fence, and the court merely affirmed its right to take judicial notice of the *propensities* of horses for playing, fighting, etc. across, over and through fences, when some of the horses are on one side of the fence, and others are on the opposite side. There was no question as to falling horses involved in the case.

In the instant case, bearing in mind the fact that the horse the Bales boy was riding was undoubtedly traveling at considerable speed at the time he fell, it appears probable that the sudden stepping into the vacuum, or hole, deflected his course, and, with the operation of the force of gravity, caused the horse's head and the fore part of his body to be drawn downward, by the sudden pull, in opposition to the accumulated momentum of the force propelling him forward, which latter was materially greater. The force and effect of this momentum propelling the horse forward being much greater than the force of gravity pulling him downward, at such shallow depth, naturally picked him up, so to speak, and

hurled him forward with sufficient force to cause a complete somersault of the horse (according to the evidence), and his being thrown upon his back, with his legs in the air. It does not seem, to us, at all impossible, in view of the evident facts and circumstances, that the same force propelling the horse forward, being proven to have been sufficient to throw him completely over on his back, was sufficient, also, to propel him a distance of 9 feet, if the total distance was 15 feet, the minimum estimated by Mr. Simpson, or to propel him 12 feet, if the distance was 18 feet (Simpson's maximum), or even 14 feet, if the distance was 20 feet as testified to by Mr. Pray. It is improbable, we believe, that the momentum, or accumulated force, propelling the horse forward, occasioned by the speed with which he was traveling, would be barely, or precisely, sufficient to cause a complete somersault, and yet insufficient to propel him a few feet farther.

In order to arrive at the verdict for the plaintiff which they did not reach, the jurors were required, under the court's instructions and under the law, to find that the accident was immediately caused by the horse stepping in the hole, which hole, as has been stated, was artificially created, and which it was the duty of defendants, in the exercise of ordinary or reasonable care, to remedy, or give warning thereof to their invitees participating in the race. On the other hand, if the jurors had believed, from the evidence, and concluded that the immediate cause of the accident was the horse tripping over the small mound or knoll, surrounded by the wind-blown sand, which was about 12 feet (according to Delbert Allen's testimony) from the blood spot, or imprint of the horse, the jurors could not, under the court's instructions and the law, have found in favor of the plaintiff, for the reason that the presence of the knoll or mound was part of the natural condition of the terrain, and so clearly incident to a cross-country race that the deceased boy would be held to have assumed

the risk of any danger thereby entailed, and the defendants would, of course, not have been liable. Whether the horse stepped in the hole or tripped over the mound was an important question of ultimate fact, not seen sufficiently by any eye-witness to enable him to testify positively in regard thereto. The evidence of Pray and Simpson for the plaintiff, and that of La Verne Allen and Delbert Allen for the defendants, was in conflict as to the fact of the distance between the imprint of the horse, or the near-by blood spot, and the nearest hole, a very material fact in determining, circumstantially, the ultimate and vital fact of whether or not the falling of the horse and the consequent injury and death of Carl Elvis Bales were immediately caused by the horse stepping in the hole, or whether or not they were caused by his tripping over the mound. Presumably, the jurors, in order to reach the verdict returned by them, believed the evidence of the above-mentioned witnesses of plaintiff, and found such ultimate fact in accordance with plaintiff's theory, and rejected the theory of defendants.

Under the rule long adhered to by this court and conceded by defendants, we must affirm the judgment, based upon the verdict of the jury, when the evidence is in conflict and there is substantial evidence to support the verdict, unless, from all the evidence in the case, it is clear that a wrong conclusion has been reached, or, as sometimes expressed, that the verdict was clearly wrong. We have not been able to conclude that there is sufficient basis in fact for the contention that the plaintiff's theory as to the immediate cause of the accident, or that the verdict of the jurors adopting such theory, is so clearly contrary to any physical fact or to the operation of any physical law as to render the conclusion of the jury clearly wrong. For statements of the rule as to our duty in reviewing the findings of a jury as to matters of fact, see: Strattan v. Raine, 45 Nev. 10, 197 P. 694, 200 P. 533; Smith v. Goodin, 46 Nev. 229, 206 P. 1067; Page v. Walser, 46 Nev. 390, 213 P. 107.

The case of Knock v. Tonopah & Goldfield R. Co., 38 Nev. 143, 145 P. 939, 940, L.R.A.1915F, 3, cited by defendants in their reply brief, is not controlling. In that case the court merely stated the general principle as follows:

"If any physical fact made it impossible for the engineer to back up without signal and crush the respondent's arm, such fact would control, and the testimony in case of respondent would fall. If his testimony regarding any matter essential to his recovery were contradicted by any physical fact, the case would have to be remanded."

But in that case the existence of such contradictory physical facts was not found. Likewise, in the instant case. The jury did not so find, and we are unable, from the evidence or from any rule of physics of which this court would have the right to take judicial notice, to conclude that a wrong conclusion has been reached by the jury, or that the verdict was clearly erroneous. We commend, however, the able and earnest manner in which counsel for the defendants have presented and briefed this and other important issues and controversial questions in the case. In fact, all the briefs in the case have been well prepared, and have been of much assistance to the court.

The foregoing presentation of our views sufficiently disposes of the assignments of error Nos. 1, 2, and 3.

Assignment of error No. 4 states that the trial court erred in refusing to give defendants' requested instructions identified as D-25 and D-26.

This court does not believe that the trial court committed error in not giving defendants' proposed instruction D-25. We believe that the trial court's instruction No. 21 sufficiently covers the ground embraced in No. D-25, and that the jurors were fairly and sufficiently instructed by said instruction No. 21 upon the question of contributory negligence, as applicable to a child of the age of the deceased, Carl Elvis Bales.

■ Defendant's requested instruction D-26 merely related to the degree of the duty of the deceased child "to look out for his own safety," and was, we believe, sufficiently presented by the court's instructions as to contributory negligence, particularly said instruction No. 21.

Assignment of error No. 5 charges the trial court with error in giving the court's instructions numbered 13, 26, 32, and 34.

We do not find that instruction No. 13 was erroneous. We have, in this opinion, mentioned such presumption. It was clear from other instructions that negligence of the injured party, even though the same was slight in degree, would defeat recovery—in other words, that the presumption was a rebuttable presumption.

■ The court's instruction No. 26 was not sufficiently comprehensive, and, considered alone, did not correctly state the law; but, we believe the deficiencies therein were sufficiently supplied by the court's instruction No. 34. We are aware that the defendants contend that even instruction No. 34 does not correctly state the law, and we concede that said instruction could have been improved in clarity and, with advantage, developed further and made somewhat more comprehensive. We do not believe, however, that instructions numbered 26 and 34, considered together, are so deficient as to be properly held prejudicially erroneous. We are of the opinion that, taking and considering together all of the instructions which were given by the court, the jurors were sufficiently and fairly instructed. We adhere to the rule long followed by this court and well expressed by Mr. Justice DUCKER in Nevada Transfer & Warehouse Co. v. Peterson, supra, on pages 101, 102 of 60 Nev., and page 638 of 99 P.2d, as follows:

"So the question raised was fairly and explicitly submitted to the jury. Considered together, the two instructions correctly state the law on this phase of the case. It is well settled by a line of decisions dating from the

earliest history of the court that all of the instructions must be taken together by the jury and considered together. Caples v. Central P. R. Co., 6 Nev. 265; Allison v. Hagan, 12 Nev. 38; Solen v. Virginia & Truckee R. Co., 13 Nev. 106; Cutler v. Pittsburgh Silver Peak Gold Min. Co., 34 Nev. 45, 116 P. 418. Moreover, the court instructed the jury not to select a single instruction, or a portion of an instruction alone, but to consider all of the instructions together in determining any issue in the case."

We do not find that the court's instruction No. 32 was erroneous.

From the foregoing, it is apparent that, in our view, assignments of error numbered 4 and 5 are without merit.

It properly follows, from the foregoing determinations and conclusions which we have found and reached, that the judgment of the trial court, rendered upon the verdict of the jury, and that court's order denying defendants' motion for a new trial, should each be affirmed. It is hereby so ordered.